UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CHRISTIAN ALEJANDRO ESTRELLA,<br>Defendant. | Case No. 19-cr-00517-SI-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 21 |

On May 15, 2020, the Court held a hearing on defendant Christian Alejandro Estrella's motion to suppress evidence. After careful consideration of the parties' arguments and the evidence presented, the Court hereby DENIES defendant's motion.

**BACKGROUND**

**I.    Procedural Background**

On October 10, 2019, the government filed an indictment charging Estrella with one count of violating 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition. Dkt. No. 1. The indictment alleges, "[o]n or about August 14, 2019, in the Northern District of California, the defendant, Christian Alejandro Estrella, knowing he had been previously convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, to wit, one 9mm Ruger P85 handgun bearing serial number 301-23327, and ammunition, namely, 9 rounds CCI 9mm Luger ammunition…." *Id*. at 3.

On January 21, 2020, Estrella filed a motion to suppress "evidence obtained via unlawful seizures and searches undertaken by Lakeport Police Department officers on or about August 14, 2019." Dkt. No. 21 ("Mot") at 1. In support of his motion, Estrella has filed his own declaration, a

copy of the Lakeport Police Department ("LPD") report concerning his August 14, 2019 arrest, a computer-aided dispatch recording from the date of his arrest, and footage from LPD Officers Trouette's and Cooley's body worn cameras. In support of its opposition to the motion, the government filed declarations from Officers Trouette and Cooley; a copy of Estrella's LPD "Gang Registration" form; a copy of Estrella's Notice and Conditions of Parole dated September 6, 2016; a copy of Estrella's Notice and Conditions of Parole dated November 4, 2019; Officers Trouette's and Cooley's body cam footage; and a duplicate copy of the computer-aided dispatch recording from the date of Estrella's arrest.[1]

## II. Factual Background[2]

Officer Tyler Trouette is a police officer with the Lakeport Police Department and has been a member of the Lake County Gang Task Force since 2015. Trouette Decl. ¶¶ 1, 4 (Dkt. No. 30-1). The Lake County Gang Task Force ("LCGTF") is a county-wide joint task force with participants from several law enforcement agencies operating in Lake County. *Id*. ¶ 4. Officer Trouette states that "[a]s a member of the LCGTF, I participated in monthly LCGTF meetings, at which the task force discusses gang activity in Lake County as well as individual gang members and law enforcement efforts relating to crimes perpetrated by gangs." *Id*. As a member of the task force, Trouette investigates criminal activity related to gangs. *Id*. Trouette states that he has experience investigating Hispanic criminal street gangs, including the Sureños, Norteños, and subgroups of those gangs, and has knowledge of gang tattoos and gang clothing. *Id*. ¶ 5. Officer Trouette is the point person for all gang-related police work at the LPD. *Id*.

---

[1] The parties submitted the same body cam footage for Officer Cooley. The footage from Officer Trouette's body camera that was submitted by the defense is approximately four minutes and forty-one seconds long, and does not show the portion of the encounter when the officers first encountered Estrella and spoke with him and searched him and his car. The government submitted a much longer version of Officer Trouette's body cam footage that shows the entire encounter with Estrella. The government's opposition states that Officer Trouette's body cam footage "had not properly been tagged to the case [and] it was not produced with the other body cam footage." Opp'n at 6.

[2] This order primarily cites to the declarations of Officers Trouette and Cooley for the factual background. The Court has reviewed the body cam footage and the dispatch recording and finds that those materials are consistent with the events as described in the officers' declarations.

2

Officer Trouette's declaration states,

> On July 2, 2018, Mr. Estrella visited the LPD to register as a gang member. Mr. Estrella had a prior conviction that required him to register as a gang member with the Lakeport Chief of Police upon moving to Lakeport, pursuant to California Penal Code Section 186.30. I was not at the police department that day but was informed of his visit by LPD personnel. Mr. Estrella met with LPD's records supervisors and a patrol officer and, together with them, completed the gang registration form. . . .
>
> LPD personnel informed me of Mr. Estrella's visit and that he had recently moved to Lakeport after being released from prison. They informed me that he was on parole and was a member of the Angelinos Heights Surenos. Upon learning of Mr. Estrella's registration, I reviewed information regarding his criminal history and his previous gang-related convictions.
>
> On July 3, 2018, I went to Mr. Estrella's residence on Polk Street in Lakeport, California to do a compliance check. Mr. Estrella answered the door and I spoke with him inside his residence. I told Mr. Estrella that I had not yet reviewed his gang conditions, but I presumed that they included that he could not associate with other gang members or possess things that are associated with the gang. Mr. Estrella said that he knew all the rules. Later in the conversation, I told him that LPD had knowledge of the Angelinos Heights Sureños and that he would not get away with wearing Oakland Athletics' hats or other things like that. Based on my training and experience, I know Oakland Athletics' hats are commonly worn by members of the Angelinos Heights Sureños because, to members of the gang, the "A" on the hat signifies "Angelinos."
>
> Around the same time, I spoke with Mr. Estrella's Lake County parole officer about Mr. Estrella. Over the course of 2018 and 2019, I had several additional conversations with Mr. Estrella's parole officer about Mr. Estrella. In some of these conversations, we discussed Mr. Estrella's conditions of parole and gang terms. In or around April 2019, Mr. Estrella's parole officer informed me that Mr. Estrella had violated his parole by committing a battery. In none of my calls with Mr. Estrella's parole office did he inform me that Mr. Estrella's parole was expiring in the near future. I believed that Mr. Estrella's parole continued into 2020 or beyond based on my experience that California parole is generally three to four years from the parolee's release from prison and I was informed that Mr. Estrella was released from prison shortly before I first met him in July 2018.
>
> Based on my training and experience, I knew prior to August 2019 that all CDCR parolees are required to submit their person, residence, or property under their control to search upon request by any peace officer.

*Id*. ¶¶ 6-10.

On August 14, 2019, Officer Trouette was on patrol in a marked LPD car with Officer Cooley, a new member of the LPD and in LPD's field training program. *Id.* ¶ 11. Officer Trouette was Officer Cooley's Field Training Officer, and it was his responsibility to provide training and mentorship to Officer Cooley. *Id.* Officer Cooley was driving and Officer Trouette was in the passenger seat. *Id.* ¶ 12. While on patrol, Officer Trouette saw Mr. Estrella, who he said was

"standing in front of his residence next to a silver two-door car." *Id.* Officer Trouette told Officer Cooley to turn around so that that they could talk to Mr. Estrella. *Id.* Officer Troutte's declaration states, "I wanted to talk to Mr. Estrella to check up on him and verify that he was abiding by the terms of his parole. As a training tool, I did not disclose information about Estrella to Officer Cooley as I wanted him to find the relevant information through his own investigation." *Id.*

Officer Trouette's declaration continues:

> As we pulled up, I noticed that Mr. Estrella was wearing a black Oakland Athletics' hat, which I knew at the time was a violation of his parole condition that he not wear gang attire.
>
> After getting out of the patrol car, Officer Cooley and I walked towards Mr. Estrella, who walked towards us. I did not tell Mr. Estrella to stop or to walk towards us.[3] Officer Cooley asked Mr. Estrella what he was up to today. Mr. Estrella said he had got off work and was working on his car, pointing to the silver two-door car. I told Mr. Estrella that I saw him and figured I would come talk to him.
>
> I asked Mr. Estrella about the hat he was wearing. Mr. Estrella said that it was a work hat.
>
> Mr. Estrella's mother came out from the house and asked Mr. Estrella what was going on. I told her that we had seen Mr. Estrella and decided to come talk to him to see what was new. I told her that he was not in trouble, that I had just seen him standing on the street.

*Id.* ¶¶ 13-16.

Officer Cooley then asked Mr. Estrella if he had identification on him. *Id.* ¶ 17; Cooley Decl. ¶ 9. Estrella said that he had identification in his car, and then he walked to the car, retrieved his wallet, and walked back to where Officer Cooley was standing. *Id.* Cooley then asked Estrella if he was on probation or parole, and Estrella said he was on parole and handed Cooley his California

---

[3] Officer Cooley also states in his declaration that he did not tell defendant to stop. Cooley Decl. ¶ 8 (Dkt. No. 30-2). Mr. Estrella states in his declaration that when he was working on his car, he saw a police car drive by on the street perpendicular to him, and then saw the police car turn around and immediately come in his direction. Estrella Decl. ¶ 3 (Dkt. No. 22-1). Mr. Estrella then states, "The police car parked abruptly and an officer indicated to me to stop" before the officers got out of their vehicle. *Id.* Defendant contends that there is a dispute of fact as to whether either officer "indicated" to him that he should stop. The officers' body cam footage begins after the officers have exited the patrol car, and thus does not refute or corroborate Mr. Estrella's claim that the officers "indicated" that he should stop before they got out of the car.

Because the Court concludes that Officer Trouette knew that defendant was on parole, the Court finds that to the extent there is a factual dispute, it is immaterial because California law provides that every parolee "is subject to search or seizure . . . at any time of the day or night, with or without a search warrant or with or without cause." Cal. Pen. Code § 3067(b)(3).

4

driver's license. Cooley Decl. ¶ 9. Officer Cooley then pat-searched Estrella and did not find anything. *Id.* ¶ 10. Officer Cooley then contacted dispatch and provided Mr. Estrella's information "to check for wants and warrants." *Id.* ¶ 11. Dispatch responded that Mr. Estrella was on CDC parole due to a conviction for resisting an executive officer with a discharge date in 2020, and that Estrella was also on probation through October 2019 with the requirement that he submit his property and person to search. *Id.* Dispatch also informed Officer Cooley that Estrella was flagged locally as a convicted felon and an Angelinos Heights gang member. *Id.*

As Officer Cooley prepared to search Estrella's car, Officer Trouette asked Estrella if Cooley would find anything in the car. Trouette Decl. ¶ 19. Mr. Estrella responded, "yeah, a gun. I don't want to get in trouble for it." *Id.* Officer Trouette then placed Mr. Estrella in handcuffs. *Id.* In response to questions from both officers, Mr. Estrella said the gun was loaded and in the middle console. *Id.*; Cooley Decl. ¶ 14. Officer Cooley then opened the driver's side door of the car and found a loaded Ruger 9mm handgun from the center console. *Id.*

**LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. When a search is conducted without a warrant, the analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Ninth Circuit has held that "a suspicionless search of a parolee's person, when conducted in accordance with the 'clear and unambiguous' terms of a lawfully imposed search condition, will generally be deemed reasonable under the Fourth Amendment." *United States v. Cervantes*, 859 F.3d 1175, 1182 (9th Cir. 2017) (quoting *Samson v. California*, 547 U.S. 843, 852-54 (2006)); *see also United States v. Korte*, 918 F.3d 750, 754 (9th Cir. 2019) (suspicionless search of car was lawful under California's parole-search condition).

The government bears the burden of establishing that a warrantless search was reasonable

1  and did not violate the Fourth Amendment. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir.
2  1992), *cert. denied,* 510 U.S. 900 (1993) (citations omitted).

## DISCUSSION

California Penal Code section 3067(b)(3) provides that every parolee "is subject to search or seizure … at any time of the day or night, with or without a search warrant or with or without cause." In *Samson*, the United States Supreme Court reviewed California's parole-search condition to determine "whether a suspicionless search, conducted under the authority of [section 3067], violates the Constitution." 547 U.S. at 846. Because parolees "have severely diminished expectations of privacy by virtue of their status alone" and because "[t]he State's interests" in supervising parolees and reducing recidivism "are substantial," the Court upheld California's parole-search condition. *Id*. at 852-53.

There are two limitations on this search condition. First, "[t]he search condition validates a search only if the police had advance knowledge that the search condition applied before they conducted the search." *United States v. Caseres*, 533 F.3d 1064, 1076 (9th Cir. 2008); *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005). Second, the search cannot be "arbitrary, capricious, or harassing." Cal. Pen. Code § 3067(d) ("It is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment."); *see also Samson*, 547 U.S. at 856 ("The concern that California's suspicionless search system gives officers unbridled discretion to conduct searches … is belied by California's prohibition on 'arbitrary, capricious or harassing' searches." (citations omitted)).

Defendant contends that he was seized under the Fourth Amendment when the officers approached him and questioned him on the street, and that the subsequent searches that flowed from that seizure were unlawful. Defendant contends that it is undisputed that Officer Cooley did not know that Estrella was on parole at the inception of the encounter, and that Officer Trouette did not have objective, confirmed knowledge that Estrella was still on parole, and thus the seizure and search of the vehicle cannot be justified as a parole seizure and search. Defendant alternatively argues that if the Court concludes that Officer Trouette's knowledge of Estrella's parole status was

1    sufficient, the search is nevertheless unlawful because it was arbitrary and capricious because
2    Officer Trouette used Estrella as a "guinea pig" for Officer Cooley's training.
3          The government argues that the initial encounter between the officers and Estrella was
4    consensual and not a seizure, and that in any event, Officer Trouette's knowledge of Estrella's parole
5    status justified every search and seizure at issue.  The government contends that Trouette had a
6    reasonable belief that Estrella's parole-condition was active on August 14, 2019 based on his July
7    2018 meeting with Estrella, his training and experience regarding the standard terms of California
8    parole, and his multiple conversations with Estrella's parole office in 2018 and 2019, which included
9    communications about the Estrella's violation of parole in April 2019 and the fact that in none of
10   his calls with the parole officer did the officer inform him that Estrella's parole was expiring in the
11   near future.  The government also emphasizes the fact that approximately one minute and thirty
12   seconds into the encounter – prior to the pat search and the car search – Estrella stated that he was
13   on parole, and that dispatch confirmed Estrella's parole status prior to the car search.  The
14   government also argues that the search and seizure was not arbitrary or capricious for the same
15   reasons.  Finally, the government argues that although Officer Trouette's and Cooley's knowledge
16   differed during the course of their encounter with Estrella, their knowledge is imputed to each other
17   under the collective knowledge doctrine.  *See United States v. Villasenor*, 608 F.3d 467, 475 (9th
18   Cir. 2010) (stating the collective knowledge doctrine "allows courts to impute police officers'
19   collective knowledge to the officer conducting a stop, search or arrest" if (1) "law enforcement
20   agents are working together in an investigation but have not explicitly communicated the facts each
21   has independently learned," or (2) "an officer . . . with direct personal knowledge of all the facts
22   necessary to give rise to reasonable suspicion . . . directs or requests that another officer . . . conduct
23   a stop, search or arrest."); *see also United States v. Ramirez*, 473 F.3d 1026, 1036 (9th Cir. 2007)
24   ("[W]here one officer directs another to take some action, there is necessarily a 'communication'
25   between those officers, and there are necessarily functioning as a team.").
26         The Court concludes that Officer Trouette's knowledge of Estrella's parole status justified

the initial detention/questioning[4] of Estrella, and that his knowledge combined with the confirmation of Estrella's parole status justified the pat search and car search. The evidence shows Officer Trouette knew of defendant's parole-search condition prior to August 14, 2019, and that he reasonably believed that Estrella was still on parole at the time of the August 14, 2019 encounter – a belief that was correct and confirmed by both Estrella and dispatch. Officer Trouette became familiar with Mr. Estrella after Mr. Estrella visited the LPD to register as a gang member in July 2018, and Officer Trouette had previously visited Mr. Estrella's residence on Polk Street in Lakeport to do a parole compliance check. In 2018 and 2019, Officer Trouette had several conversations with Estrella's parole officer, and he states that "in some of these conversations, we discussed Mr. Estrella's conditions of parole and gang terms." Trouette Decl. ¶ 9. Officer Trouette states that he "believed that Mr. Estrella's parole continued into 2020 or beyond based on my experience that California parole generally is three or four years from the parolee's release from prison and I was informed that Mr. Estrella was released from prison shortly before I met him in July 2018." *Id*. The Court finds that this level of knowledge is sufficient. *See Samson*, 547 U.S. at 846-47 (officer knew defendant based on prior contact and was aware he was on parole, stopped and questioned him, and searched him after confirming parole status with dispatch).

Additionally, Officer Trouette's body cam footage shows that he knew defendant and believed that he was on parole. The footage shows that Officer Trouette told Mr. Estrella's mother, "we just saw him and came out here to talk to him. *See what's new*." Dkt. No. 30-5 at 1:35 (emphasis added). Further, Officer Trouette referred to defendant by his first name: "I just saw Christian and figured I'd pop in. I work gangs." *Id*. at 1:45. Additionally, Officer Trouette asked, "what is with the hat dude," and states, "I drove by and saw you wearing an A's hat." *Id*. at 4:05. Officer Trouette told Mr. Estrella, "… like I said *the first day I met you* … I drove by and saw you flying your Angelino Height's A, which technically … is *a violation of your parole*." *Id*. at 4:14 (emphasis added). Officer Trouette's body cam footage clearly shows he knew defendant and believed him to be a California parolee.

---

[4] The Court assumes *arguendo* that Estrella was detained.

8

The cases cited by defendant are distinguishable in that they involve situations where the officers did not learn of the defendants' parole conditions until after the searches. *See Caseres*, 533 F.3d at 1076 (suppressing search where "[t]here is no evidence that Lt. Murphy knew Caseres was a parolee of the State of California, to whom § 3067(a) applied. Nor is there is evidence that Lt. Murphy knew whether Caseres's prior offense had been committed prior to January 1, 1997."[5]); *Moreno*, 431 F.3d at 639 ("It is undisputed, however, that Deputies Banks and Garcia were not aware of Moreno's parole status or of the outstanding arrest warrant at the time of the seizure.").

The Court also finds that the detention and searches were not arbitrary, capricious or harassing. As discussed *supra*, Officer Trouette knew about Estrella's gang registration and believed he was on parole. Estrella was wearing an A's hat, which Trouette knew was a violation of Estrella's parole conditions. The fact that, as a training matter, Trouette did not communicate all of this knowledge to Cooley prior to or at the inception of the encounter does not render the detention and subsequent searches harassing. Nothing in the record suggests that the officers conducted the search "for an improper purpose, such as a desire to harass him or out of personal animosity toward him." *Cervantes*, 859 F.3d at 1183. Instead, the officers "appear to have conducted the search solely for legitimate law-enforcement purposes." *Id*.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion to suppress.

**IT IS SO ORDERED**.

Dated: May 26, 2020

SUSAN ILLSTON
United States District Judge

---

[5] California's suspicionless parole-search condition only applies to inmates eligible for release on parole for offenses committed on or after January 1, 1997. Cal. Pen. Code § 3067(c). Estrella was born in 1994, *see* Dkt. No. 30-1, Ex. A, and thus there is no question whether Trouette knew that Estrella's offenses had been committed after January 1, 1997.